# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CHRISTIAN W. C. RYSER,<br><br>          Appellant,<br><br>          v.<br><br>JOHN E. ERNEST and MARGARET F.<br>ERNEST, husband and wife and their<br>marital community, and THOMAS<br>ERNEST,<br><br>          Respondents,<br><br>JOHN E. ERNEST and MARGARET F.<br>ERNEST REVOCABLE LIVING TRUST<br>dated May 11, 1991; DOUGLAS<br>ERNEST; KEVIN T. BERGIN and JANE<br>DOE BERGIN, husband and wife and<br>their marital community, and doing<br>business as KEVIN BERGIN<br>CONSTRUCTION; AMERICAN<br>CONTRACTORS INDEMNITY<br>COMPANY BOND NO. 100095964;<br>LARRY B. DRAVIS and VICKY D.<br>DRAVIS, husband and wife and their<br>marital community; INDIAN POINT<br>PROPERTIES, LLC, a Washington<br>limited liability company; JOHN or<br>JANE DOE I through V; and ABC<br>ENTITIES I through V,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | DIVISION ONE<br><br>No. 72532-7-I<br><br>UNPUBLISHED OPINION<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>FILED: October 19, 2015 |

DWYER, J. — It is the responsibility of a court, when reviewing a jury's

verdict, to give effect to the verdict if the intent of the jury can be ascertained and

such intent is consistent with legal principles. In this way, the court honors the jury's constitutionally prescribed function in resolving legal disputes. In this case, Christian Ryser claims that the jury's verdict is internally inconsistent and that he is, therefore, entitled to relief from that verdict. To the contrary, a fair reading of the verdict indicates that Ryser is mistaken, that the jury properly performed its function, and that he is not entitled to relief. Accordingly, we affirm.

I

Ryser, John E. Ernest, and Margaret F. Ernest (the Ernests) are former neighbors. Thomas Ernest and Douglas Ernest are John and Margaret's sons. Ryser and the Ernests owned adjacent parcels of property on Vashon Island. This case arises out of a longstanding dispute between the parties involving the use of a driveway that separated their properties.

The driveway at issue was longer than most and included three "switchbacks." The driveway began upland on the Ernests' property (Parcel A) and traveled down a slope toward the water, ending at a beachfront level parking area on Parcel B (also owned by the Ernests).[1]

In 2003, Ryser purchased property that abutted Parcel B.[2] In order to access his property, Ryser traversed the switchbacks on the driveway.

In navigating the switchbacks on the driveway, a user crossed various properties owned by different people including Ryser, the Ernests, and neighbors Larry and Vicky Dravis. Although prior owners of the Ernests' property had

---

[1] John and Margaret Ernest testified that Parcel B had been surveyed twice: in 1979 and in 2000.

[2] Ryser testified that he never had his property surveyed.

granted Ryser's predecessors in interest a prescriptive easement over a portion of the Ernests' property in order to access the Ryser property, John Ernest maintained that Ryser had "no legal right" to cross either Parcel A or B.[3]

Ryser bought his property with the intention of spending two years remodeling the house thereon. Thereafter, he intended to "weigh [the] options" of either living in the house or selling the property.

Ryser testified that one of his plans, "made . . . very early on in [his] ownership," was to sell the property to a friend, Brian Nelson, for $750,000.[4] Ryser and Nelson entered into a "gentleman's agreement," signified by a handshake.[5] Even though Ryser had entered into this "tentative" agreement with Nelson, he believed that his property was worth more than $750,000. When Ryser expressed this view to Nelson "he said if you can get [more than $750,000], then that's probably a good idea. You should explore that."[6]

---

[3] The jury heard testimony from John Ernest about a prior lawsuit that the Ernests filed against Ryser arising out of the use of the driveway for access to the Ryser property. The Ernests dismissed the suit in November 2006.

[4] In a pretrial deposition, Ryser testified that he entered into the agreement with Nelson in 2007.

[5] Although this agreement was never reduced to writing, Ryser testified that he believed it was an agreement that both parties would honor. In fact, Nelson never did purchase the property from Ryser.

[6] As to his conversation with Nelson, Ryser testified that:

I decided that the numbers that had been told – I had been told were in the millions. And so when Granum came back with 845, I talked with Brian, and we agreed that that was more than he wanted to pay at the time. Which he only wanted to pay 750,000. And so we both agreed that I should test the waters that way and see if that was possible.

Later, during re-cross examination of Ryser, the following exchange took place:

Q. And you talked with Brian Nelson in September of 2009?

A. We spoke often.

In 2008, Ryser listed his property for sale for $845,000.[7] Although the real estate market fluctuated while Ryser's property was listed for sale, real estate agent Ken Zaglin testified to his belief that the $845,000 list price was "above market value."[8] Further, Zaglin thought that John Ernest's assertions regarding the prescriptive easement adversely affected Ryser's ability to market and sell his property. Thus, Zaglin notified the listing agent, Crist Granum, to make sure that prospective buyers were "informed that [the easement] is being contested."

In December 2009, not having sold the property, Ryser filed for Chapter 13 bankruptcy.[9] In April 2010, Ryser converted to Chapter 7 bankruptcy. Ed

---

Q. Okay. Well, when was the conversation where he tells you that he is no longer interested in the property?

A. I believe that was fall, October.

Q. October 2009. And so you declared bankruptcy two months after Mr. Nelson told you that he was no longer interested in your property?

A. Approximately.

Q. Okay. And again, you didn't -- he didn't have a purchase and sale agreement that he was retracting, he just told you that there was no more gentleman's agreement?

A. Well, the gentleman's agreement had changed at that time the deal fell through, because of the most recent threats about blocking my access now.

[7] In a pretrial deposition, Ryser testified that he "listed the house for the first time – I believe it was 2008. It was in the summer, probably June, June or July."

[8] In a pretrial deposition, Ryser testified that the price of his property "changed a number of times" while it was listed. In response to a question concerning whether there were any periods of time when the property was not on the market, Ryser testified that "[i]t was – if I remember correctly, it was listed through its entirety. There may have been a very short break in there in the – while I changed to a different realtor."

[9] Ryser stopped making mortgage payments in February 2009.

Wood, the bankruptcy trustee, attempted to sell the property in order to pay some of Ryser's debts. Wood was unsuccessful.[10]

Throughout Ryser's ownership of the property, tension remained high between Ryser and the Ernests regarding use of the driveway. In fact, Ryser twice sought anti-harassment orders against the Ernests.[11] Ryser stopped using

---

[10] Wood testified that:

We listed it and my brokers tried and after a while they gave up and said there is just no point in this. . . . So once that that became clear that wasn't going to work, then I filed what's called a No Asset Report. The clerk then closes the case and any -- any assets that -- that the debtor had disclosed on the schedules go back to him.

The following exchange later took place between Ryser's attorney and Wood:

MR. MOBERG:

QUESTION: And what -- what impact did Mr. Ernest's position about access have on your decision to abandon this property?

ED WOOD:

ANSWER: Well, it caused it basically.

MR. MOBERG:

QUESTION: What do you mean by "it caused it basically?"

ED WOOD:

ANSWER: Well, it -- because he was taking this position and was going to threaten people. Realtors wouldn't show – wouldn't bring clients by to look at the house. You can't -- nobody is going to buy a house without looking at it. And nobody is going to want to buy it if all they can have is water access. And so it's pretty tough to market.

[11] Ryser testified that, in February 2005, his attorney sent a letter to John Ernest. A few days after sending this letter, John Ernest "came down to the house and started banging on the door in the morning." After this encounter with John, Ryser testified that he "went into Seattle to file for a temporary restraining order," which the court granted. The record does not indicate the exact date on which the restraining order was granted or what transpired later in that case.

In November 2010, the superior court granted Ryser's request for anti-harassment orders of protection against John, Margaret, and Thomas Ernest.

the property as his primary residence in November 2010, after the second requested anti-harassment order was granted.

In August 2011, John Ernest hired an excavator, Kevin Bergin, to remove landslide debris from one of the driveway switchbacks that crossed over Ryser's property.[12] John needed for the debris to be removed so that he could relocate a "dilapidated" truck that had been parked on the driveway, below the landslide, by his son Thomas.[13] At John's direction, Bergin moved the debris to another part of the driveway. A short time later, neighbor Larry Dravis complained that the debris was on his property. At John's direction, Bergin then returned the debris to its approximate original location on Ryser's property.[14] John also had Bergin place boulders on the Ernests' property that blocked Ryser's access to his property over Parcel A.[15]

Ryser's friend, Phil Balcom, checked on Ryser's property several times throughout the summer of 2011. One day, Balcom noticed that excavation work was being performed on the driveway. Balcom was able to walk up part of the driveway before reaching boulders that were "[s]panning the width of the

---

[12] The parties are not consistent regarding the month in which Bergin performed the work for John Ernest. Bergin testified that the work was performed in "June, July, something like that." John Ernest testified that the work was performed in August. The month in which Bergin performed the work is not material.

[13] Thomas testified that he parked his truck entirely to one side of the driveway, on Parcel B, which is owned by John and Margaret. Ryser testified that the presence of Thomas's truck on the driveway "didn't allow me to get in or out of my property." Further, Ryser testified that Thomas twice parked the truck on the driveway, blocking access to his property: once in "2000, well, shoot, it's either four or five [and] . . . . [a]gain, in 2010."

[14] Bergin testified that the amount of time between removing of the debris and returning it to its approximate original location on Ryser's property was a "couple hours." John Ernest's testimony was that the debris was removed from Ryser's property for only a short time, in his estimation "[a]bout four hours."

[15] Ryser testified that his property was twice blocked by boulders placed on the Ernests' property: once in 2005 and again in 2011.

driveway." When Balcom returned "about a week later," part of the driveway was covered in landslide debris that "was just cleaned up and made like a walking path . . . [that was] clearly inaccessible for cars."

On August 2, 2011, King County Deputy Sheriff Jeff Hancock responded to a complaint from Ryser alleging that the Ernests' actions in blocking his driveway violated the existing anti-harassment order. When Hancock arrived, the driveway that he "would normally drive down to contact somebody . . . was just blocked," in that "one of the switchbacks was completely covered with dirt." Hancock observed that there was a blockage at both the top and the middle of the driveway.[16] He opined that "[i]t was just -- it was very obvious to me that it had to have been like a mechanical -- something had to have done that."

That same year, Ryser requested to relist his property for sale with Zaglin but Zaglin refused. According to Zaglin, because of the significant opposition by the Ernests, it became "untenable to sell [the property]."[17] In fact, Ryser never did sell his property on the open real estate market.[18]

In July 2012, Ryser filed a lawsuit against the Ernests, their sons, and several other parties alleging, among other claims, trespass, easement interference, and interference with a business expectancy. On October 31, 2013, John and Margaret filed a motion for summary judgment. On December 4, 2013,

---

[16] The blockage at the top of the driveway was due to the boulders that Bergin had placed there. The blockage in the middle of the driveway was due to the landslide debris.

[17] Bergin testified about a letter he wrote to Ryser, dated September 7, 2011, explaining his reasoning for declining to relist the property and extending his apologies.

[18] In November 2013, Ryser's property was sold at a foreclosure sale for $126,000, with access to the driveway blocked.

the trial court granted partial summary judgment, dismissing several of Ryser's claims. On February 4, 2014, Ryser filed an amended complaint against John, Margaret, Thomas, and Douglas Ernest. [19] In the amended complaint, Ryser alleged 14 causes of action.[20]

In March 2014, the case was tried to a jury over seven days. At the conclusion of the plaintiff's case, the Ernests' moved to dismiss the trespass claim against them, contending that Ryser had failed to introduce evidence of either proximate cause of damage or the amount of damages sustained. In response, Ryser's counsel argued:

> You don't have the right to go on to someone's property and alter it. And [the Ernests] can certainly argue to the jury that there was no damage done when—when [the Ernests] put it back on the slide. [The Ernests] put it back the same way. And [Ryser] can argue to the jury, you heard Mr. Balcom say that it wasn't there, that it wasn't [sic] cleared. He could go all the way up the driveway. You heard that when he went back he couldn't go through that area, that more debris had been covered up in that spot. You heard from Deputy Hancock that it looked like someone had mechanically piled up debris on that switchback. *And let the jury decide.* And Mr. Ryser has testified as to the change in the value of his property as a result of those actions.[21]

(Emphasis added.)

---

[19] The claims against defendants Larry Dravis, Vicky Dravis, Indian Point Properties, LLC, and Kevin Bergin were dismissed by stipulation prior to Ryser filing the amended complaint. After the filing of the amended complaint, the trial court granted an order substituting Thomas Ernest as the personal representative of Douglas Ernest's estate as a party defendant. On March 27, 2014, the trial court dismissed the claims against the estate of Douglas Ernest.

[20] The causes of action that Ryser alleged were: intentional trespass, nuisance, assault, invasion of privacy, defamation, slander of title, interference with a business expectancy, malicious harassment, unlawful harassment/negligence, cyberstalking/negligence, outrage/infliction of emotional distress, timber trespass, civil conspiracy, and easement interference.

[21] Ryser testified that his property was valued at $375,000 prior to the alleged trespass and at "zero" after the driveway was blocked by the boulders that the Ernests had Bergin place on their property. The placement of the boulders was material evidence on the easement interference claim but was not material to the trespass claims.

The trial judge denied the motion to dismiss, honoring Ryser's request to "let the jury decide." Ultimately, the claims submitted to the jury were for easement interference, trespass, nuisance, interference with a business expectancy, and intentional infliction of emotional distress.

The trial court instructed the jury that, as the "sole judges of the credibility of the witness[es] . . . [and] the value or weight to be given to the testimony of each witness," each juror was charged with the "duty to decide the facts in this case," after considering all of the evidence presented at trial. Jury Instruction 1.

In Jury Instruction 5, relating to Ryser's trespass claims,[22] the jurors were instructed:

## TRESPASS

In order to prove his trespass claim, Christian Ryser must prove the following elements took place after July 31, 2009:

(1) The defendant entered onto Christian Ryser's lands; [and]

(2) The defendant wrongfully caused waste or injury to the land or improvements on the land; and

(3) The defendant knew or reasonably should have known that he lacked authorization to so act, and

(4) The amount of the damages caused by the wrongful actions of defendant.

For purposes of the second element of Trespass, a person acts "wrongfully" if the person intentionally and unreasonably commits the act or acts while knowing, or having reason to know, that he or she lacks authorization to so act.

---

[22] One cause of action for trespass was asserted against John and Margaret. A second cause of action for trespass was asserted against Thomas.

Damages recoverable under this section include, but are not limited to, damages for the market value of the property removed or injured, and for injury to the land, including the costs of restoration.

If you find from your consideration of all the evidence that each of these propositions has been proved, your verdict should be for the plaintiff. On the other hand, if any of these propositions has not been proved, your verdict should be for the defendant.

In Jury Instruction 9, relating to Ryser's interference with a business expectancy claim, the jurors were instructed:

### INTERFERENCE WITH BUSINESS EXPECTANCY

In order to prove his Claim of Interference with Business Expectancy Christian Ryser must prove the following elements;

(1) existence of a valid business expectancy; and;

(2) the defendant's knowledge of the facts and circumstances giving rise to the existence of an expectancy; and

(3) intentional conduct by the defendant; and

(4) that caused the expectancy to terminate sometime between July 31, 2009 and March 29, 2010 or November 19, 2010 and December 8, 2011; and

(5) defendant's interference was for an improper purpose or by an improper means; and

(6) defendant's conduct was a proximate cause of damage to plaintiff.

For claims of interference with an opportunity to buy or sell land, all that is needed is a relationship between parties contemplating a contract, with at least a reasonable expectation of fruition. The defendant does not have to actually know of the particular expectancy relationship as long as the defendant knows or reasonabl[y] should know that an expectancy may exist from the facts and circumstances known to defendant.

If you find from your consideration of all the evidence that each of these propositions has been proved, your verdict should be for the plaintiff on this claim. On the other hand, if any of these propositions has not been proved, your verdict should be for the defendant on this claim.[23]

---

[23] In addition to trespass and interference with a business expectancy, the jury also was instructed on the following claims:

## EASEMENT INTERFERENCE

In order to prove his easement interference claim, Christian Ryser must prove the following elements took place after July 31, 2009:

(1) The defendant unreasonably interfered with plaintiff's right to use the easement driveway; and

(2) The defendant's interference proximately caused plaintiff damages

If you find from your consideration of all the evidence that each of these propositions has been proved, your verdict should be for the plaintiff on this claim. On the other hand, if any of these propositions has not been proved, your verdict should be for the defendant on this claim.

Jury Instruction 4.

## NUISANCE IN GENERAL- DEFINITION

Nuisance is unlawfully doing an act or failing to perform a duty, which act or failure to act:

(1) Annoys, injures, or endangers the comfort, repose, health or safety of others;

(2) Offends decency; or

(3) In any way renders other persons insecure in life, or in the use of property.

Jury Instruction 6.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

On Plaintiff's outrage claim, the Plaintiff has the burden of proving each of the following propositions took place after July 31, 2009:

(1) That the Defendant engaged in extreme and outrageous conduct;

(2) That the Defendant's conduct caused severe emotional distress to the Plaintiff;

On March 30, 2014, the jurors entered a verdict on Verdict Form A, as follows:

---

(3) That the Defendant intentionally or recklessly caused the emotional distress; And

(4) That the Plaintiff was a direct recipient of the extreme and outrageous conduct.

Conduct may be considered extreme and outrageous only when the conduct is so extreme in degree and outrageous in character as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

Severe emotional distress is emotional distress so extreme that no reasonable person could be expected to endure it. It must be reasonable and justified under the circumstances, not exaggerated and unreasonable, unless it results from a peculiar susceptibility of the plaintiff of which the defendant had knowledge. Mere annoyance, inconvenience, or the embarrassment that normally occurs in a confrontation between parties is not enough. A showing of bodily harm or objective symptoms is not necessary to prove severe emotional distress, although bodily harm or objective symptoms may be considered as evidence of severe emotional distress.

If you find from your consideration of all the evidence that each of these propositions has been proved, your verdict should be for the Plaintiff on the outrage claim. On the other hand, if you find that any of these propositions has not been proved, your verdict should be for the Defendants on this claim.

Jury Instruction 11.

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

| | |
|---|---|
| CHRISTIAN W.C. RYSER, | No. 12-2-25731-1 SEA |
| Plaintiffs, | VERDICT FORM A |
| vs. | |
| JOHN E. ERNEST and MARGARET F. ERNEST, husband and wife and their marital community; *et al.* | |
| Defendants. | |

**FILED**
KING COUNTY, WASHINGTON

MAR 2 8 2014

SUPERIOR COURT CLERK
BY Marcella Guzman
DEPUTY

1. We, the jury, find that the Plaintiff proved his claim of trespass against John and Margaret Ernest:

   Yes: ✓_____          No:_____

2. We, the jury, find that the Plaintiff proved his claim of trespass against Thomas Ernest:

   Yes: ✓_____          No:_____

3. We, the jury, find that the Plaintiff proved any of his remaining claim(s) against Thomas Ernest, and/or John and Margaret Ernest:

   Yes: ✓_____          No:_____

*Instruction: If you have answered "No" to questions 1, 2, and 3, skip the next questions and have the presiding juror sign and date the verdict form. If you have answered "Yes" to any of these questions, answer the remaining questions.*

4. We, the jury, find that the Plaintiff was damaged by the claims proved against the Defendants:

   Yes: ✓_____          No:_____

5. We, the jury, find for the Plaintiff in the following sums:

   Trespass:_ *Zero*_____

Economic Damages: $ 201,581

Non-Economic Damages: Zero

DATE: 3/30/14 _____    _____
Presiding Juror

On April 24, 2014, Ryser filed two motions. One motion was for additur or, in the alternative, a new trial. Ryser limited this motion to the issue of damages on his trespass claims, alleging that the jury's award of "zero" damages was erroneous. The second motion was for judgment notwithstanding the verdict and

an award of reasonable costs associated with his trespass claims, including an award of attorney fees. The trial court denied both motions.

Ryser appeals.

II

Despite arguing to the trial court that the questions of proximate cause and proof of damages on his trespass claims were for "the jury [to] decide," Ryser now assigns error to the trial court's denial of his posttrial motions, alleging that the jury's verdict of "zero" damages is inconsistent with its answers to questions one and two on Verdict Form A, which indicated that he proved his trespass claims against John and Margaret, and Thomas Ernest, respectively.

Ryser contends that the jury's answer to question one on Verdict Form A, finding that he "proved his claim of trespass against John and Margaret Ernest," is inconsistent with the jury's answer to question five, in which it found that he had proved an entitlement to a sum of "zero" on the trespass claim.[24] After reviewing the entirety of Verdict Form A, together with the instructions that the jury was provided, and in light of the evidence at trial, we disagree. Fairly read, the jury's answers are consistent and indicate that Ryser did not prevail on either of his trespass claims.

It is a rule of long standing that:

> In ascertaining the meaning of a verdict or special findings of
> a jury, the language used is to be liberally construed. In the text of
> 22 Ency. Plead. & Prac., 955, which seems to be well supported by
> the decisions, it is said:

---

[24] Although Ryser asserts identical claims of error with regard to the two trespass claims, he does not argue the trespass claim against Thomas in his appellate briefing.

"In the construction of a verdict, the first object is to learn the intent of the jury, and when this can be ascertained such effect should be allowed to the findings, if consistent with legal principles, as will most nearly conform to the intent. The jury's intent is to be arrived at by regarding the verdict liberally, with the sole view of ascertaining the meaning of the jury, and not under the technical rules of construction which are applicable to pleadings."

Cameron v. Stack-Gibbs Lumber Co., 68 Wash. 539, 544, 123 P. 1001 (1912); accord Bickelhaupt v. Inland Motor Freight, 191 Wash. 467, 469, 71 P.2d 403 (1937) ("Verdicts are to be construed liberally, and, if the intention of the jury can be reasonably ascertained therefrom, effect should be given to that intention.").

Time has not diminished the force of those observations. Courts continue to be of the view that, rather than rely on technical rules of construction that are applicable to pleadings, "the best rule is to view the verdict in light of the instructions and the record to see if the clear intent of the jury can be established." Meenach v. Triple "E" Meats, Inc., 39 Wn. App. 635, 639, 694 P.2d 1125 (1985). In engaging in this review, the court's objective is to "learn the intent of the jury, and when this can be ascertained, such effect should be given to the verdict, if consistent with legal principles, as will most nearly conform to the intent. The jury's intent is to be arrived at by regarding the verdict liberally, with the sole view of ascertaining the meaning of the jury." Wright v. Safeway Stores, 7 Wn.2d 341, 344, 109 P.2d 542 (1941) (citing Cameron, 68 Wash. at 544). A verdict will not be overturned where it is "neither impossible nor difficult to determine [the jurors'] intent from the record." Meenach, 39 Wn. App. at 639. In particular, "an appellate court must try to reconcile the answers to special

interrogatories." Alvarez v. Keyes, 76 Wn. App. 741, 743, 887 P.2d 496 (1995); Van Cleve v. Betts, 16 Wn. App. 748, 757, 559 P.2d 1006 (1977).

In challenging the jury's verdict, Ryser bears the burden of demonstrating that the verdict is erroneous in the manner in which he contends. Knatvold v. Rydman, 28 Wn.2d 178, 183, 182 P.2d 9 (1947) ("It is not our function or duty to search the record for errors, but only to rule as to errors specifically claimed."); Mattice v. Dunden, 193 Wash. 447, 450, 75 P.2d 1014 (1938) ("'There is a presumption in favor of the correctness of the judgment entered and, in the absence of an affirmative showing of error, it will be sustained.'" (quoting Greene v. Nat'l Sur. Co., 140 Wash. 230, 231, 248 P. 803 (1926))); Johansen v. Mulligan, 45 Wash. 529, 531, 88 P. 1107 (1907) (burden is on party alleging error to show it affirmatively on the record); Sellers v. Pac. Wrecking & Salvage Co., 34 Wash. 111, 112, 74 P. 1056 (1904) ("[E]rror is never presumed; it must be shown affirmatively by the record.").

Herein, it is useful to explain how the jury instructions relate to Verdict Form A prior to discussing the verdict. In Jury Instruction 5, the jury was instructed as to the following elements of proof for the claims of trespass:

(1) The defendant entered onto Christian Ryser's lands; [and]

(2) The defendant wrongfully caused waste or injury to the land or improvements on the land; and

(3) The defendant knew or reasonably should have known that he lacked authorization to so act, and

(4) The amount of the damages caused by the wrongful actions of defendant.

In Jury Instruction 9, the jury was instructed as to the following elements of proof for the claim of interference with a business expectancy:

(1) existence of a valid business expectancy; and;

(2) the defendant's knowledge of the facts and circumstances giving rise to the existence of an expectancy; and

(3) intentional conduct by the defendant; and

(4) that caused the expectancy to terminate sometime between July 31, 2009 and March 29, 2010 or November 19, 2010 and December 8, 2011; and

(5) defendant's interference was for an improper purpose or by an improper means; and

(6) defendant's conduct was a proximate cause of damage to plaintiff.

The jurors gave effect to Jury Instructions 5 and 9 by answering special interrogatories on Verdict Form A. Question one asked the jurors whether Ryser had "proved his claim of trespass" against John and Margaret Ernest. Question two asked whether Ryser had "proved his claim of trespass" against their son Thomas.[25] Question three asked whether Ryser had "proved any of his remaining claim(s) against Thomas Ernest, and/or John and Margaret Ernest."[26]

---

[25] Questions one and two stated:

1. We, the jury, find that the Plaintiff proved his claim of trespass against John and Margaret Ernest:

Yes: _____    No: _____

2. We, the jury, find that the Plaintiff proved his claim of trespass against Thomas Ernest:

Yes: _____    No: _____

[26] Question three stated:

If the jurors answered "Yes" to either question one, two, or three, they were further instructed, in a separate statement on the verdict form, to then proceed to questions four and five.[27] Question four asked whether Ryser "was damaged by the claims proved against the Defendants." Question five asked for the jury to indicate the "sums," if any, to be awarded to Ryser.[28]

The best way to understand the jury's verdict in light of the court's instructions and the specific interrogatories set forth on the verdict form is that the elements of proximate causation and quantification of damages, in both the trespass and the interference with a business expectancy claims, were removed from the elements of proof in questions one, two, and three. Indeed, there would be no purpose to question four, asking the jurors whether Ryser was "damaged

---

3. We, the jury, find that the Plaintiff proved any of his remaining claim(s) against Thomas Ernest, and/or John and Margaret Ernest:

Yes: _____      No: _____

[27] The separate instruction stated:

*Instruction: If you have answered "No" to questions 1, 2, and 3, skip the next questions and have the presiding juror sign and date the verdict form. If you have answered "Yes" to any of these questions, answer the remaining questions.*

[28] Questions four and five stated:

4. We, the jury, find that the Plaintiff was damaged by the claims proved against the Defendants:

Yes: _____      No: _____

5. We, the jury, find for the Plaintiff in the following sums:

Trespass: _____

Economic Damages: _____

Non-Economic Damages: _____

by the claims proved," if the elements of proximate cause and quantification of damages were already part and parcel of the previous questions. Moreover, there would be no reason for the jury to assume that the court had (by posing question four) asked it a meaningless question.[29] Finally, question four is an imperfect question. It does not allow for separate responses as to the three groups of claims set forth in questions one, two, and three, respectively. Thus, if *any* damages were shown to have been proximately caused, the answer of "Yes" was required, no matter the particular cause of action to which the damages evidence pertained.

This construction of Verdict Form A is consistent with the jury's "zero" verdict on Ryser's trespass claim against John and Margaret Ernest. The jury answered "Yes" to question one, finding that Ryser "proved his claim of trespass" against John and Margaret. After answering questions two and three, the jury then proceeded, as instructed, to questions four and five relating to damages. In answer to question four, the jury found that Ryser was "damaged by the claims proved against the Defendants."[30] In answer to question five, on the line next to the word "Trespass," the jury wrote "zero."

When the jury's "zero" verdict on trespass is read in light of this construction, together with Jury Instruction 5, it can be ascertained that the jury

---

[29] Our construction views question four as inquiring into whether proximate cause of damage was proved and question five as inquiring whether the amount of damages was proved by competent evidence. These two issues were merged in Jury Instruction 5 element (4).

At oral argument, Ryser's counsel admitted that, pursuant to Ryser's reading of Verdict Form A, if either question 1 or 2 or 3 were answered "yes," then question 4 could never be answered "no." This reading of the verdict form renders question 4 a meaningless question.

[30] In context, it was reasonable for the jury to read that question as asking whether it found that Ryser was "damaged by [any of] the claims proved against the Defendants."

found that John and Margaret Ernest committed an act or acts constituting trespass, but that Ryser suffered "zero" damages as a result, because he either failed to prove proximate cause or failed to establish the amount of his damages (or both). Moreover, the jury's written answer of "zero," in response to an interrogatory that asked for a "sum," indicates that the jurors exercised their duties carefully and as instructed.[31] Ryser's assertion that an award of "zero" damages on the trespass claims indicates that the jury failed to consider all of the evidence or follow its instructions fails to account for the fact that the jurors were instructed—as the ultimate fact finders, assessors of credibility, and evaluators of the weight that should be given to the evidence—that they were free to credit or discredit any testimony.

A review of the testimony admitted at trial confirms our determination that the jury's "zero" verdict on Ryser's trespass claim is consistent with its answer to question one. Ryser's own testimony put forward facts that militated against a finding that he was actually damaged by the various movements of the landslide debris. Ryser testified that at the time of the alleged trespass by John and Margaret, his property was already blocked by the landslide,[32] that he was not living on the property at that time, that he had not attempted to clear the landslide, and that he did not plan to clear it for several months.[33] Bergin's

---

[31] Indeed, had the jury answered "not proved," rather than "zero," it would not have answered with a "sum" as directed by the court.

[32] Ryser testified that the landslide occurred in December 2010.

[33] Rsyer testified about his intentions to move the landslide debris, stating that:

You know, if I was given the chance I still had the intention of doing something about it. But you can't -- this is [a] bunch of gooey mud and this is in December.

testimony further militated against a finding of actual damage to Ryser: he stated that he "put [the] slide back right where it was." Moreover, Bergin opined that the road appeared "abandoned"[34] and that the amount of time between removing the debris and returning it to its approximate original location on Ryser's property was a "couple hours." Finally, John Ernest testified that Bergin returned the debris to its approximate original location on Ryser's property after a short time, in his estimation, "[a]bout four hours."[35] Finally, it was only after neighbor Larry Dravis objected to the landslide debris being moved onto his property that the decision was made to return the debris to its approximate original location on Ryser's property.

Based on the evidence presented at trial, a "zero" verdict on the trespass claim indicates either that the jury did not credit Ryser's testimony and evidence that he suffered measurable damage or that the jury believed that he failed to prove proximate cause of damage at all (or both). Because the jury's intent can

My thought when I saw this was holy Christ. Now I -- not only do I get this truck blocking down there, now there is a big pile of mud here. If I am going to move this, I have got to wait until springtime, maybe summer. Late summer would be a good idea [to] let it dry out. Then you can get a truck to take it out. So the best thing to do is just let the sucker dry out. And so that's what I did.

[34] Bergin testified that the road "had grass growing up on it for who knows how long. Nobody has been driving on that thing."

[35] While it is so that Ryser testified that his property was worth $375,000 prior to the alleged trespass and "zero" after Bergin blocked the driveway with boulders, the jury was not bound to credit this testimony. First, the testimony as to the placement of the boulders was material to the easement interference claim, not to the trespass claim. But even if the jury construed this testimony as pertaining to the value of the Ryser property after the landslide, the jury was not bound to believe that the landslide had rendered the property valueless. Thus, it was not bound to believe that Bergin's actions had that effect.

Finally, the jury was not bound to accept Ryser's valuation of his property as being worth $375,000 prior to the landslide. Indeed, he testified to various values of the property at various times. And the jury heard clearly that one thing was true—no willing buyer ever bought the property from Ryser on the free market at a price that he believed the property to be worth. While Ryser's testimony as to the value of his property was admissible, it was hardly binding on the jury.

be ascertained based on the trial record and in light of the evidence and instructions given, we must give effect to the jury's "zero" verdict on Ryser's trespass claim against John and Margaret Ernest.

Our construction of Verdict Form A is also consistent with the jury's award of $201,581 in economic damages against John and Margaret Ernest for the claim of interference with a business expectancy. The jury answered "Yes" to question three, finding that Ryser "proved any of his remaining claim(s)" against John, Margaret, or Thomas Ernest.[36] The jury then proceeded, as instructed, to questions four and five relating to damages. In answer to question four, the jury found that Ryser was "damaged by the claims proved against the Defendants."[37] In answer to question five, on the line next to the words "Economic Damages," the jury wrote "$201,581."

When the jury's "$201,581" verdict on economic damages is read in light of this construction, together with the court's instruction on interference with a business expectancy (Jury Instruction 9), we can ascertain that the jury's answer of "Yes" to question four, finding that Ryser was "was damaged by the claims proved against the Defendants," is a product of the jury finding that Ryser proved causation of damages on this claim—as opposed to the trespass claims. As Ryser himself notes in his appellate brief, "[p]resumably the jury found [he] had proven his claim of intentional interference with [a] business expectancy because

---

[36] One of Ryser's remaining claims was interference with a business expectancy.

[37] Again, in context, it was reasonable for the jury to read that question as asking whether it found that Ryser was "damaged by [any of] the claims proved against the Defendants."

- 23 -

the amount of economic damages found was the difference between the failed sale price and the debt owed."[38]

Because we find that the jury's answer of "zero" as to question five is consistent with its answers to questions one and four, we affirm the trial court's denial of Ryser's motion for additur or, in the alternative, a new trial on the trespass claim against John and Margaret Ernest.

In so doing, we need not reach the question of whether, as Ryser asserts, the jury's verdict was the result of passion or prejudice. We need not reach this question because Ryser has not met his burden of demonstrating that the verdict was erroneous at all, much less his burden to establish that the verdict was erroneous as to the amount of damages proved on his trespass claim against John and Margaret.

Indeed, as the appellant, Ryser bears the burden of perfecting the record on appeal. Rhinevault v. Rhinevault, 91 Wn. App. 688, 692, 959 P.2d 687 (1998) (citing In re Marriage of Haugh, 58 Wn. App. 1, 6, 790 P.2d 1266 (1990)). "The court may decline to reach the merits of an issue if this burden is not met." Rhinevault, 91 Wn. App. at 692 (citing State v. Wheaton, 121 Wn.2d 347, 365, 850 P.2d 507 (1993)).

Herein, Ryser has provided us with a verbatim transcript of his closing and rebuttal arguments but *did not* provide us with a verbatim transcript of the Ernests' closing argument.[39] Thus, we cannot review how the Ernests (the

---

[38] The "debt owed" was the mortgage debt.

[39] Nor did he provide us with a transcript of Thomas's counsel's closing argument.

prevailing parties) argued the case to the jury. Such attempts by litigants to "slant the playing field" in their favor are universally met with the disfavor of the appellate court. Absent the actual record, we will assume that the defendants' counsel argued the case to the jury precisely as we have analyzed it herein.[40] Ryser's claim of error fails.

III

Next, Ryser contends that the jury's answer to question two on Verdict Form A, finding that Ryser "proved his claim of trespass against Thomas Ernest," is inconsistent with the jury's answer to question five in which the jury found for Ryser in the sum of "zero." A fair reading of Verdict Form A, together with the instructions provided to the jury, and viewed in light of the evidence at trial, establishes that Ryser is wrong, for many of the same reasons that we set forth in the analysis of his trespass claim against John and Margaret.

As previously discussed in evaluating the jury's "zero" verdict on Ryser's trespass claim against John and Margaret, Verdict Form A effectively separated the elements of proximate causation and quantification of damages from the elements of proof necessary to answer questions one and two. This same construction is consistent with the jury's "zero" answer to question five, when coupled with its affirmative answer to question two. Our construction of the relationship between questions one, four, and five is identical to our construction of the relationship between questions two, four, and five.

---

[40] An appellate court will assume that matters omitted from the record on appeal were in support of the judgment. See, e.g., Gould & Co. v. Mt. Baker Savings & Loan Ass'n, 185 Wash. 253, 53 P.2d 841 (1936); see also Whittaker v. Weller, 21 Wn.2d 716, 152 P.2d 957 (1944).

A review of the evidence offered to the jury regarding Thomas's alleged trespass illustrates the weakness of the claim. The jury heard Thomas Ernest testify that he parked a truck on Parcel B.[41] Further, Thomas testified that, on one occasion, he placed rocks and glass on Ryser's doorstep. On cross-examination, the jury also heard Thomas testify that at the end of a "get-together" in 2008 he left "fireworks on Parcel B, with the intention of coming back the next day and removing them." It is not clear from the record which of these acts, if any, formed the basis for Ryser's trespass claim against Thomas.[42] In closing argument, Ryser's counsel did not clear up the confusion.[43] The only trespass claim that Ryser's counsel argued to the jury was the incident in which John Ernest hired Bergin to remove the landslide debris from the driveway. No mention was made of the trespass claim alleged against Thomas, much less any

---

[41] Thomas testified that he parked the truck on Parcel B in August 2010.

[42] Ryser's amended complaint, filed on February 14, 2004, alleged the following incidents of trespass specifically against Thomas:

> On information and belief, defendant Thomas Ernest and a group of unknown others entered the Ryser property without plaintiff's permission, threw a party, left garbage and trash around the property, and shot fireworks at the plaintiff's home on the Ryser property.
>
> . . . .
>
> On another occasion in 2010, plaintiff saw defendant Thomas Ernest in his yard. Plaintiff told defendant Thomas Ernest to leave, and he refused to leave. Mr. Ernest said he was on the phone with a judge who was allowing him to be on the Ryser property without plaintiff's permission.

In Ryser's motion for additur or, in the alternative, a new trial, he did not discuss the trespass claim against Thomas.

[43] In Ryser's motion for judgment notwithstanding the verdict and an award of attorney fees, Ryser argued that "[t]he trespass against Thomas Ernest was clearly based on his actions in placing a rock and glass on Mr. Ryser's doorstep." No such contention was argued to the jury.

- 26 -

argument as to what the particular wrongful act was or what the proper measure of damages had been established to be.

In light of the evidence, and the decision of Ryser's counsel not to address the claim in any way in closing argument, it reasonably appears that the jury found that Thomas committed an act or acts of trespass (either with the parked truck, by rocks and glass, or by leaving firework debris on the driveway), but that Ryser did not establish either that he was proximately caused damage by the act or acts or did not prove how damages could be quantified. Because the jury's intent can be ascertained based on the evidence presented, the instructions given, and the content of closing argument, we must give effect to the jury's "zero" verdict on Ryser's trespass claim against Thomas Ernest.

Because we conclude that the jury's "zero" answer to question five is consistent with its answer to question two, we affirm the trial court's denial of the motions for additur or a new trial on this claim. There was no error.

IV

Finally, Ryser contends that the trial court erred by denying his motion for an award of attorney fees and costs pursuant to RCW 4.24.630(1).[44] Ryser also requests attorney fees on appeal pursuant to RAP 18.1(a). Because Ryser was

---

[44] RCW 4.24.630(1) provides, in pertinent part:

> Damages recoverable under this section include, but are not limited to, damages for the market value of the property removed or injured, and for injury to the land, including the costs of restoration. In addition, the [trespasser] is liable for reimbursing the injured party for the party's reasonable costs, including but not limited to investigative costs and reasonable attorneys' fees and other litigation-related costs.

not the prevailing party on his trespass claims, he was not and is not entitled to recover an award of attorney fees or costs pursuant to either the statute or the rule.

Affirmed.

Dwyer, J.

We concur:

Trickey, J.

Cox, J.